# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 13, 2013

## STATE OF TENNESSEE v. CLEO HENDERSON

**Appeal from the Criminal Court for Shelby County**
**No. 1007069, AT3270    James C. Beasley, Jr., Judge**

_____

**No. W2012-01480-CCA-R3-CD  - Filed November 21, 2013**

_____

Appellant, Cleo Henderson, was convicted by a Shelby County jury of second degree murder. The trial court sentenced him as a Range II, violent offender to forty years in the Tennessee Department of Correction.  On appeal, appellant has presented several issues that we have deemed waived; however, we have reviewed his sufficiency of the evidence and sentencing issues.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Cleo Henderson (on appeal), Memphis, Tennessee, Pro Se; Juni Ganguli and James Thomas (at trial), for appellant, Cleo Henderson.

Robert E. Cooper, Attorney General and Report; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Reginald Henderson and Pam Fleming, Assistant District Attorneys General, for appellant, State of Tennessee.

**OPINION**

I. Facts

This case concerns the January 2010 shooting death of Reubin Jefferson outside of Luster's Sundry, a grocery store and club, in Memphis, Tennessee.  A Shelby County grand jury indicted appellant for first degree premeditated murder, and the State sought the death penalty.  The parties presented the following proof at appellant's February 2012 trial:

Roney McNeal testified that he was the victim's son and that he had last seen the victim two days before his murder. He identified a picture of the victim, which was published to the jury.

Earnest Wilbourn testified that he accompanied the victim to Luster's Sundry on January 15, 2010. He explained that he had known the victim for most of his life and that he had known appellant since the 1980s. That night, he saw appellant approach the victim in the club. The victim and appellant exited the club, and Mr. Wilbourn followed them outside. Mr. Wilbourn said that a crowd of people also followed them out. He testified that he observed appellant and the victim arguing. Mr. Wilbourn said that he stepped between them and tried to stop the argument. He recalled that appellant "made a gun play" by reaching behind his back. Appellant told the victim "'I'll kill you b****,'" and the victim "took his shirt off." Mr. Wilbourn testified that the victim's removing his shirt indicated that he wanted to fight. According to Mr. Wilbourn, appellant's brother was present and was trying to hold appellant back. Mr. Wilbourn pushed the victim back and told him, "'[L]et's go back in the club.'" Mr. Wilbourn said that he had already stepped through the club's door, believing that the victim was following him, when he heard a gunshot. He stepped back outside and saw the victim lying on the ground. He went to the victim and called 9-1-1. Mr. Wilbourn said that the victim had been shot in the head but that his leg was still moving at that point. Mr. Wilbourn testified that he followed the ambulance to the hospital and later spoke with the police. He further testified that he never saw the victim with a weapon that night and that the victim never indicated to him that he had a weapon.

On cross-examination, Mr. Wilbourn agreed that he told the police in his statement that appellant and the victim had argued about Sandra Brown, the woman whom appellant was dating. He disagreed that the victim had "pimped" Ms. Brown.

Ylonda Hymon testified that on January 15, 2010, she went to Luster's Sundry. She said that she saw appellant sitting with Sandra Brown and Constance Hymon-Brown. Ms. Hymon saw the victim and Mr. Wilbourn arrive. Ms. Hymon said that she danced with the victim and that they sat down at a table. Ms. Hymon testified that appellant approached the victim and asked the victim "'to let him holler at him.'" The victim and appellant went outside, and several people followed. She went outside a few minutes later and heard the men arguing. Ms. Hymon testified, "I heard [appellant] say b****[,] and then he shot him." The victim fell when he was shot, and appellant ran to the victim and stood over him, "like if he was going to get up[,] he was going to shoot him again." Ms. Hymon said that appellant then left and ran through an alley. On cross-examination, Ms. Hymon testified that she saw one of the men near appellant pass a gun to him.

Constance Hymon-Brown testified that she went to Luster's Sundry on January 15, 2010. She recalled sitting at a table with her husband, appellant, and Sandra Brown. Ms. Hymon-Brown testified that when the victim entered the club, appellant commented about the victim's talking about appellant behind his back. Appellant went over to the victim and told him, "'[L]et me holler at [you].'" The two men left, and Ms. Hymon-Brown followed them a minute later. When she went outside, she saw them arguing. She testified that appellant acted like he was going to walk away and that Mr. Wilbourn was trying to get the victim to return to the club. She said that Mr. Wilbourn and the victim were about to enter the club when appellant turned around and shot the victim.

Ms. Hymon-Brown testified that she never saw the victim with a weapon that night. She said that appellant also did not have a weapon, until a man handed him one just before he shot the victim. She agreed that the victim had taken off his shirt, but she said that Mr. Wilbourn "was getting him to go back in the building."

Sandra Brown testified that she went to Luster's Sundry on January 15, 2010, with her sister-in-law, Ms. Hymon-Brown. Appellant sat at their table in the club. Ms. Brown recalled seeing the victim speaking with Ylonda Hymon. Ms. Brown testified that appellant "called [the victim] outside." The men went outside, and she followed after several minutes. Ms. Brown said that the men were arguing and name-calling. She testified that "[o]ne thing led to another," and appellant shot the victim. She recalled that appellant's brother had been trying to hold him back and that Mr. Wilbourn had been with the victim. Ms. Brown said that she saw appellant reach behind him, to the back of his belt, for his gun. She did not see the victim with a weapon that night. Ms. Brown testified that appellant ran away after he shot the victim and that she also ran away. She called appellant later, and he picked her up. She spent that night with him. The following day, she spoke with the police.

On cross-examination, Ms. Brown agreed that she had not known appellant long prior to January 2010 and that they had been dating for a few weeks at that point. She said that she had known the victim for sixteen years. Ms. Brown testified that she had dated the victim and that the victim "had pimped [her] out." Ms. Brown said that the men were not angry when they were in the club. She agreed that when she saw them outside, the victim appeared angry and had taken off his shirt. She said that Mr. Wilbourn tried to stop the fight and that she did not see anyone hand a gun to appellant.

On re-direct examination, Ms. Brown testified that prior to the confrontation between appellant and the victim, appellant had told her and Ms. Hymon-Brown that the victim "had said something about him."

Sergeant Robert M. Edwards, a felony response officer with the Memphis Police Department, testified that he responded to a shooting call on January 15, 2010, at Luster's Sundry. He said that twenty to thirty witnesses were detained at the scene. He and another officer gathered the witnesses' contact information, but the witnesses were not cooperative, each of them saying that they did not see anything.

Dr. James Lewis Caruso testified that he performed the victim's autopsy. He said that the bullet entered the left side of appellant's face but did not exit his body. The bullet damaged the right side of the victim's brain. The victim's blood alcohol content was 135 milligrams per deciliter. The victim also had cannabinoids, the active ingredient in marijuana, in his blood stream. The cause of the victim's death was a gunshot wound to the head, and the manner of death was homicide.

Sergeant Michael A. Brown from the Memphis Police Department's homicide bureau testified that he investigated the victim's homicide. He said that most of the witnesses from the club did not cooperate but that four to five witnesses gave statements. He spoke with appellant three and a half to four months after the shooting. Sergeant Brown testified that appellant had gone to Missouri but turned himself in to the police sometime after a warrant for his arrest was issued. In his April 9, 2010 statement, appellant told Sergeant Brown that he was responsible for the victim's death. Appellant said that he asked the victim to step outside to talk because of something the victim had said the week before this incident. Appellant told Sergeant Brown that the victim became outraged and that Mr. Wilbourn handed the victim a gun, which appeared to be a .38 or a 9mm silver handgun. Appellant said that someone also gave him a gun and that he turned around and shot the victim. He said that he ran from the scene, dropping the gun in an alley. Appellant told Sergeant Brown that he shot the victim because he believed the victim was going to shoot him. He also said that he had heard that Mr. Wilbourn had collected the gun from the victim after the shooting. Appellant told Sergeant Brown that he fled to Missouri after the shooting and turned himself in later because he was tired of running. Following this testimony, the State rested its case-in-chief.

On behalf of appellant, Matthew Goodman testified that he heard the victim "cussing [appellant] out" at the club on January 15, 2010. He said that appellant wanted to talk to the victim to "'straighten this out.'" The men went outside, and ten to fifteen other people also went outside, including Mr. Goodman. Mr. Goodman said that the victim was "[c]onstantly trying to come towards" appellant and was calling appellant names. Mr. Goodman testified that the victim reached for something on his side but that he never saw the victim produce anything. Mr. Goodman stated that the victim told appellant that "he was going to blow his a** off." Mr. Goodman testified that the bystanders tried to separate the men. At first they were successful at separating them, but the victim kept trying to cross over to appellant.

-4-

Appellant went around a corner, returned, and shot the victim. Mr. Goodman recalled seeing Mr. Wilbourn hugging the victim after the shooting and said that it "looked like he was trying to get something off of" the victim. Mr. Goodman testified that he never spoke with the police about the shooting but that he spoke with two private investigators at separate times.

On cross-examination, Mr. Goodman testified that he spoke with the first private investigator three to four days after the shooting and the second investigator one week after the shooting.[1] Mr. Goodman testified that the victim never removed his shirt during the altercation. He also testified that appellant never approached the victim in the club and that appellant followed the victim outside to talk.

Following the close of proof and deliberations, the jury convicted appellant of second degree murder. The trial court held a sentencing hearing at which the only evidence presented was the presentence report. The trial court found appellant to be a Range II, multiple offender. The trial court applied three enhancement factors: (1) appellant had a criminal history beyond that necessary to establish the range; (2) appellant possessed a firearm during the commission of the crime; and (3) appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann § 40-35-114(1), (9), (10). The trial court did not find that any mitigating factors applied. The trial court sentenced appellant to forty years, to be served as a violent offender at one-hundred percent. *See* Tenn. Code Ann. § 40-35-501(i)(1), (2)(B) (no release eligibility when convicted of second degree murder).

Appellant, through counsel, filed a motion for new trial alleging that the evidence was not sufficient to support the conviction. Following the trial court's denial of the motion, appellant requested that his counsel withdraw so that he could pursue a pro se appeal. The trial court granted appellant's request, and appellant filed a timely notice of appeal. This matter is now properly before this court.

## II. Analysis

### A. Pro Se Motions

Appellant contends that the trial court erred by not ruling on appellant's pro se motions, including a motion to amend his motion for new trial and various pre-trial motions.

---

[1] According to Mr. Goodman, the second investigator was Rachel Guiser. The record indicates that she was the investigator hired by appellant's employer during the general sessions phase of the proceedings.

Tennessee Rule of Criminal Procedure 33(b) provides that trial courts should liberally allow amendments to the motion for new trial until the day of the motion hearing. *See also State v. Lowe-Kelley*, 380 S.W.3d 30, 34 (Tenn. 2012); *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010). Nonetheless, the trial court retains discretion to deny such amendments. *See Lowe-Kelley*, 380 S.W.3d at 34. "Once the hearing on the motion for new trial is heard and an order denying a new trial has been entered, however, motions to make additional amendments must be denied." *Hatcher*, 310 S.W.3d at 804.

In this case, appellant's counsel filed a motion for new trial on April 30, 2012, alleging only that the evidence was insufficient to support the convictions. The record includes a pro se motion to amend the motion for new trial, allegedly signed by appellant on May 17, 2012; however, there is no indication of when the motion was filed. The trial court, on June 22, 2012, heard the motion for new trial as filed by counsel. Subsequently, the court denied the motion and allowed counsel to withdraw so that appellant could represent himself on appeal. After the denial, the trial court could no longer entertain amendments to the motion for new trial. *See Hatcher*, 310 S.W.3d at 804. Thus, the issue is whether appellant's pro se motion to amend, submitted while he was represented by counsel, was proper.

"[I]t is well-established that defendants are generally restricted from representing themselves while simultaneously being represented by counsel." *Williams v. State*, 44 S.W.3d 464, 469 (Tenn. 2001). A defendant does not have a constitutional right "to participate [i]n propria persona in his own defense and simultaneously to be represented by participating counsel." *State v. Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976). This court has previously held that under *Burkhart*, it was not error for a trial court to refuse to hear a defendant's pro se motions when the defendant was represented by counsel at the time he filed the pro se motions. *See State v. Muse*, 637 S.W.2d 468, 469-70 (Tenn. Crim. App. 1982) (citing *Burkhart*, 541 S.W.2d at 371); *see also State v. Richard C. Taylor*, No. M2005-01941-CCA-R3-DD, 2008 WL 624913, at *28 (Tenn. Crim. App. March 7, 2008).

Here, appellant was represented by counsel when he attempted to file a motion to amend the motion for new trial. Thus, the motion to amend was not proper, and the trial court did not err by ruling solely on the motion for new trial filed by appellant's counsel. *See Muse*, 637 S.W.2d at 469-70. This authority also applies to appellant's claim that the trial court erred by failing to rule on certain pro se pre-trial motions. Appellant was represented by counsel at the time, and therefore, the trial court's refusal to rule on the motions was proper. *See id.* (citing *Burkhart*, 541 S.W.2d at 371); *Richard C. Taylor*, 2008 WL 624913, at *28.

## B. Jury Instructions

Appellant contends that the trial court erred when instructing the jury on self-defense. This issue was not included in the motion for new trial filed by appellant's trial counsel, which was the only motion for new trial properly before the trial court. Therefore, appellant's claims regarding jury instructions are waived under Tennessee Rule of Appellate Procedure 3(e).

## C. Waiver of Argument Regarding Indictment

Appellant argues on appeal that the district attorney general abused his authority by seeking an indictment against appellant for first degree murder in the absence of probable cause. Any motion regarding the defects in the institution of the prosecution or in the indictment must be made prior to trial. Tenn. R. Crim. P. 12(b)(2). Appellant filed a pro se motion prior to trial regarding this argument; however, as previously discussed, a defendant cannot act in propia persona while represented by counsel. *See Burkhart*, 541 S.W.2d at 371. Thus, this issue was not properly presented prior to trial, and as a result, appellant has waived appellate review. *See* Tenn. R. Crim. P. 12(b)(2).

## D. Ineffective Assistance of Counsel

Appellant claims that he received ineffective assistance of counsel at trial, citing numerous allegations in his appellate brief. Initially, we note that this court has repeatedly warned appellants against presenting claims of ineffective assistance of counsel on direct appeal because (1) it may be difficult to establish ineffective assistance without an evidentiary hearing and (2) raising the issue on direct appeal bars appellant from raising the issue in a post-conviction petition. *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992); *State v. Thomas D. Taylor*, No. E2011-00500-CCA-R3-CD, 2012 WL 6682014, at *9 (Tenn. Crim. App. Dec. 21, 2012). In this case, appellant did not raise the issue in his motion for new trial, and indeed, it would have been impractical to do so because he was still represented by his allegedly ineffective counsel. Furthermore, he has not presented any evidence that his trial counsel were ineffective, and the trial court has not had the opportunity to make findings of fact with regard to this issue. Therefore, it would be inappropriate for us to consider this issue at this juncture. However, our abstention does not prevent appellant from presenting this issue in an appropriate post-conviction proceeding. *See State v. Belcher*, 03C01-9608CC00299, 1997 WL 749392, at *6 (Tenn. Crim. App. Nov. 26, 1997); *see also State v. Jim Gerhardt*, No. W2006-02589-CCA-R3-CD, 2009 WL 160930, at *19 (Tenn. Crim. App. Jan. 23, 2009).

## E. Transcripts

Appellant contends that he was prevented from presenting certain issues on appeal because the trial court did not have all parts of the trial transcribed for the record, especially voir dire, opening arguments, and closing arguments. An indigent defendant has the right to a free transcript of the proceedings of his case if necessary "to vindicate a legal right." *State v. Elliott*, 524 S.W.2d 473, at 475-76 (Tenn. 1975) (citing *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)). Tennessee Code Annotated section 40-14-312 also provides that a trial court must provide a complete transcript of the proceedings for an indigent defendant. In this case, the trial court provided transcripts of a pre-trial motion to suppress hearing, the trial testimony, and the sentencing hearing. The transcripts included in the record are sufficient to facilitate appellate review of the issues properly presented to this court. Therefore, any error on behalf of the trial court in not including portions of the trial proceedings requested by appellant in the transcripts is harmless.

## F. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his conviction for second degree murder. He contends that the evidence showed that he acted in self-defense and that the State did not prove the venue nor the time of the offense. In addition, he claims that the jury's verdict was compromised because second degree murder and voluntary manslaughter have the same elements, as he perceives them. The State responds that it proved the elements of second degree murder beyond a reasonable doubt. The State also contends that it proved venue and that the offense occurred prior to the indictment. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn

therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As applicable to this case, second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210.

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id*. § 39-11-106 (2010). Appellant asserted self-defense as an affirmative defense. Pursuant to Tennessee Code Annotated section 39-11-611(b)(2),

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

*Id*. § 39-11-611.

Viewed in the light most favorable to the State, the evidence at trial showed that appellant shot the victim in the head outside of Luster's Sundry in Memphis, Tennessee, on January 15, 2010. Witnesses testified that appellant and the victim argued but that the victim was returning to the club when appellant aimed a gun at him and pulled the trigger. Thus, the evidence was sufficient for a rational jury to conclude that appellant shot the victim, knowing that his conduct was reasonably certain to cause the victim's death.

Regarding appellant's claim of self-defense, the only evidence presented at trial that the victim had a gun was appellant's self-serving statement to the police. The other witnesses testified that while the victim had been prepared to fight, there was never a physical altercation. They further testified that the confrontation was essentially over before the shooting and that the victim did not have a weapon. The jury, as was its prerogative, accredited the testimony of the State's witnesses regarding the incident over appellant's version of events, and by its guilty verdict of second degree murder, the jury rejected appellant's affirmative defense. In doing so, the jury resolved questions of credibility of witnesses and factual disputes raised by the evidence. *See Bland*, 958 S.W.2d at 659. We will not re-evaluate the inferences drawn from the evidence by the jury or re-weigh the evidence. *See Dorantes*, 331 S.W.3d at 379.

Appellant also contests whether the State proved that the crime occurred in Shelby County. Our supreme court has summarized the law regarding venue:

> Our Constitution provides that an accused must be tried in the county in which the crime was committed. Tenn. Const. art. I, § 9; *see also* Tenn. R.Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990); see also Tenn. Code Ann. § 39-11-201(e) ( "No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Venue is a question for the jury, *State v. Hamsley*, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984), and may be proven by circumstantial evidence. *State v. Bennett*, 549 S.W.2d 949, 950 (Tenn. 1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. *State v. Johnson*, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

*State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006). In this case, at least one witness testified that Luster's Sundry is located in Memphis, and the Memphis Police Department responded to the shooting, which is sufficient evidence for any rational jury to find that the crime occurred in Shelby County, Tennessee.

Appellant also argues that the State did not prove that the crime occurred prior to the returning of the indictment. Tennessee Code Annotated section 39-11-201(a)(4) requires the State to prove beyond a reasonable doubt that the crime occurred prior to the return of a formal charge. This court has explained that "the reading of the indictment to the jury, coupled with evidence of when the offense was committed, would establish that the offense was committed prior to the return of the indictment." *State v. Brown*, 53 S.W.3d 264, 279 (Tenn. Crim. App. 2000).

Appellant's argument relies on the fact that no witness testified definitively that the victim died on January 15, 2010, which is true. In addition, the medical examiner did not testify regarding the date he performed the autopsy. The autopsy report presumably stated the date of the victim's death and the date of the autopsy, but the report is not included in the appellate record. Nonetheless, as shown by the police department's interview of appellant in April 2010, it is clear that the victim had died prior to the interview. Appellant was not indicted until November 2010, and the indictment was read to the jury at the beginning of the trial. Therefore, the State established that the offense occurred prior to the return of the indictment, and appellant's argument to the contrary is without merit.

## G. Sentencing

Regarding his sentencing, appellant first contends that the State did not file a notice of enhanced punishment. Tennessee Code Annotated section 40-35-202(a) requires the State to provide notice to the defendant and the court when it "believes that a defendant should be sentenced as a multiple, persistent[,] or career offender," and the notice should include "the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." "The purpose of subsection (a) is to provide fair notice to an accused that he is exposed to other than standard sentencing." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). In this case, the State filed a notice of intent to seek the death penalty, which set forth appellant's prior convictions, and it also filed a notice of intent to impeach with prior convictions, which also set forth appellant's prior convictions and the other items required by Code section 40-35-202(a). Both documents were filed months prior to the trial. Most tellingly, the notice of intent to impeach clearly stated that it was also notice of intent to seek enhanced punishment. Thus, we conclude that the State complied

with the statute and that appellant's argument is without merit.[2]  *See State v. Taylor*, 63 S.W.3d 400, 413 (Tenn. Crim. App. 2001); *see also State v. Tucson Biggs*, No. W2011-01182-R3-CD, 2012 WL 2952164, at *4 (Tenn. Crim. App. July 20, 2012), *no perm. app. filed*.

Secondly, appellant argues that the trial court applied enhancement factors in contravention of *Blakely v. Washington*, 542 U.S. 296 (2004).  In *State v. Cross*, 362 S.W.3d 512, 528 (Tenn. 2012), our supreme court aptly stated,

> [Appellant] fails to acknowledge or address the various decisions in which this Court has addressed the 2005 amendments to Tennessee's sentencing provisions.  This Court has held repeatedly that the 2005 amendments resolved the Sixth Amendment constitutional concerns addressed in *Blakely v. Washington* that arise when trial courts rely on enhancement factors that have not been found by a jury.

The court continued:

> Prior to being amended in 2005, Tennessee's sentencing laws set presumptive sentences in non-capital cases.  The midpoint of the sentencing range was the presumptive sentence for all Class A felonies and the statutory minimum sentence was the presumptive sentence for all other felonies.  Under the prior sentencing scheme, a trial court could not increase a defendant's sentence beyond the presumptive sentence in the absence of an enhancement factor.  However, a trial court could increase the sentence to the maximum within the range if it found even a single enhancement factor.
>
> In response to constitutional concerns arising from the United States Supreme Court's *Blakely v. Washington* decision, the General Assembly amended Tennessee's sentencing statutes to remove presumptive sentences.  These changes to the sentencing structure "enabled Tennessee's trial courts to sentence a defendant to any sentence within the applicable range as long as the length of the sentence is 'consistent with the purposes and principles' of the sentencing statutes."  The 2005 amendments to Tennessee's sentencing laws have plainly "increase[d] the amount of discretion a trial court exercises when imposing a sentencing term."  These changes also eliminated the *Blakely*

---

[2]  The appellant also argues that he was prejudiced by the lack of notice because he could not contest the trial court's use of a conviction that had been reversed and dismissed when enhancing his range; however, the trial court explicitly stated that the dismissed conviction was not used to set appellant's range.

constitutional concern with Tennessee trial courts finding the facts necessary to apply enhancement factors. Thus, we find [appellant's] argument based on *Blakely v. Washington* to be unavailing.

*Id.* at 528-29 (internal citations omitted). Likewise, appellant in the instant case fails to recognize that the sentencing arguments previously cognizable under *Blakely v. Washington* were rendered moot by the 2005 Amendments to the Sentencing Reform Act of 1989. Thus, his argument is without merit.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we conclude that no error exists in the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE